**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA F. KEELING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-CV-1414 JAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Donna F. Keeling's ("Keeling") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*

**I.     Background**

On October 23, 2008, Keeling protectively filed her applications for disability insurance under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and for SSI benefits under Title XVI of the Act, 42 U.S.C. §§1381, *et seq.* (Tr. 118) Keeling alleged disability beginning October 9, 2008, and later amended the onset date to October 11, 2008. (Id.) The Social Security Administration initially denied Keeling's claims on January 20, 2009. (Tr. 107-109) Keeling filed a timely request for hearing on February 10, 2009. (Tr. 153-155) Following a hearing on November 30, 2010 (Tr. 69-93), the ALJ issued a written decision on January 25, 2011, upholding the denial of benefits. (Tr. 115-132) Keeling then requested review of the ALJ's decision by the Appeals Council; the Appeals Council vacated the hearing decision and

remanded the case on September 4, 2012. (Tr. 133-137) Specifically, the ALJ was instructed to obtain additional evidence concerning Keeling's impairments; further consider the severity of Keeling's impairments at step two of the sequential evaluation process; obtain medical evidence from an expert if necessary to clarify the nature and severity of her impairments; further consider Keeling's maximum residual functional capacity ("RFC") and provide appropriate rationale with specific references to the supporting evidence of record; and if warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Keeling's occupation base. (Tr. 135)

Following a supplemental hearing on January 31, 2013 (Tr. 41-68), the ALJ issued a written decision on February 14, 2013 partially denying Keeling's applications and finding her disabled only after June 22, 2012. (Tr. 15-40) Keeling again timely filed a request for review of hearing decision (Tr. 14) which request was denied on June 10, 2014. (Tr. 1-6) Thus, the decision of the ALJ stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Keeling filed this appeal on August 14, 2014. (Doc. No. 1) The Commissioner filed an Answer. (Doc. 11) Keeling filed a Brief in Support of Complaint. (Doc. 21) The Commissioner filed a Brief in Support of the Answer. (Doc. 27) Keeling did not file a Reply Brief.

## II.     Decision of the ALJ

After careful consideration of the entire record, the ALJ found that prior to June 22, 2012, Keeling had the severe impairments of bipolar disorder, anxiety disorder, mild sacroilitis, mild degenerative disc disease of the lumbar and cervical spine, and idiopathic shortness of breath and tobacco abuse, but that none of these impairments or combination of impairments met or medically equaled one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1 (Tr.

21-22). The ALJ determined that prior to June 22, 2012, Keeling retained the RFC to perform light work with certain limitations. (Tr. 22) He found Keeling's impairments would not preclude her from performing work that exists in significant numbers in the national economy, including work as an addresser and information clerk. (Tr. 34) Consequently, the ALJ found Keeling was not disabled prior to June 22, 2012. (Tr. 34)

The ALJ further noted that as of June 22, 2012, Keeling had developed additional severe impairments of fibromyalgia and avascular necrosis of the left hip followed by hip replacement surgery. (Tr. 21-22) He determined that as of June 22, 2012, Keeling had the RFC to perform a sedentary level of work activity. (Tr. 32) Therefore, as of that date, there were no jobs remaining in significant numbers in the national economy that she could perform. (Tr. 34) Consequently, Keeling became disabled as defined in the Social Security Act as of June 22, 2012. (Tr. 35)

### III.    Administrative Record

The following is a summary of the relevant evidence before the ALJ.

### A.    Hearing Testimony

The ALJ held a hearing in this matter on January 31, 2013. (Tr. 41-68)  The ALJ heard testimony from Keeling and Delores E. Gonzalez, a vocational expert.

### 1.    Keeling's testimony

Keeling was 52 years old at the time of the hearing. (Tr. 43) She completed the eighth grade and does not have a GED. (Tr. 43-44) From 1998 through 2002, she worked at Target as a cashier. (Tr. 44) She last worked in 2006 at Walmart. (Tr. 44, 57)

It was Keeling's testimony that since the last hearing, she discontinued oxygen for some period of time; she could not remember when she restarted oxygen, but stated she is currently using it 24 hours a day, seven days a week. (Tr. 45, 47, 51, 63) She did not recall receiving the

results of a pulmonary function study ("PFT") showing her respiratory effort being normal without oxygen. (Tr. 45-47) Keeling was unable to remember whether any doctor had diagnosed her with Crohn's disease since the last hearing or whether she had received the care of a cardiologist in the last few years. (Tr. 47-48) She testified that either Dr. Bain or her cardiologist, Dr. Wood, told her she has congestive heart failure. (Tr. 48) She has not seen Dr. Wood since her surgery in 2009. (Tr. 48)

Keeling began seeing Dr. Hoffman in 2012 for fibromyalgia, arthritis and hip replacement. (Tr. 49, 55) She testified the hip replacement surgery helped her, although she still has problems with her legs and cannot sit or stand for very long. (Tr. 50, 55-56)

Keeling testified to having anxiety attacks (Tr. 50) and fatigue dating back to 2008. (Tr. 52) On a daily basis, her breathing problems slow her down. (Tr. 55) Activities such as walking bring on her symptoms, as does hot and humid weather. (Tr. 52-53) She uses an inhaler and a nebulizer every six hours. (Tr. 54) The medications she takes for her breathing issues make her feel "jittery." (Tr. 55)

Keeling has been diagnosed with bipolar disorder. (Tr. 56) Her condition became so severe that she could no longer deal with the public. She left Walmart in March 2006. (Tr. 57) It was Keeling's testimony that she still experiences anxiety and panic attacks, as well as manic/depressive episodes. (Tr. 58-60) Keeling testified to difficulty focusing and concentrating. (Tr. 59) She also has difficulty remembering things and concentrating. (Tr. 60)

Going back to 2008, Keeling testified that she typically wakes up at 2:00 or 3:00 a.m. She never gets a full night's sleep and frequently naps during the day. (Tr. 61-62) She doesn't leave her house very often. (Tr. 62) She doesn't do housework or cook. (Tr. 62) Keeling could not

remember the last time she drove a car. (Tr. 62) Keeling testified that certain medications she was taking for her stomach resulted in significant weight gain. (Tr. 63)

## 2. Testimony of Vocational Expert

For the first hypothetical, the ALJ asked vocational expert Dolores Gonzalez to assume an individual with Keeling's education and work experience who can lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for six hours out of eight; and sit for six hours out of eight. The individual can occasionally climb stairs and ramps, but never climb ropes, ladders, scaffolds; can occasionally stoop, kneel, crouch and crawl; and should avoid concentrated exposure to extreme cold, fumes, odors, dusts and gases, and unprotected heights. (Tr. 64) In addition, this hypothetical individual is able to understand and remember and carry out at least simple instructions and non-detailed tasks; can respond appropriately to supervisors and coworkers; can adapt to routine and simple work changes; and can maintain regular attendance and work presence without special supervision. (Tr. 64-65)

Based on this hypothetical, Gonzalez opined that such an individual could not return to her past relevant work due to the fact that the retail cashier position was semiskilled with a specific vocational preparation ("SVP") of 3. (Tr. 65) Other work such an individual could perform is cashier II, Dictionary of Occupational Titles (DOT) number 211.462-010, light and unskilled with an SVP of 2, with 1,707,343 jobs nationally and 38,064 in the state of Missouri; and mail sorter, DOT number 209.687-026, light and unskilled with an SVP of 2, with 25,532 jobs nationally and 607 in the state of Missouri. (Tr. 65)

The second hypothetical asked Gonzalez to assume the limitations of the first hypothetical with the following changes: the individual can lift 10 pounds occasionally and less than 10 pounds frequently; stand or walk two hours out of eight; and sit for six hours out of

eight. (Tr. 65) In Gonzalez's opinion, such an individual could work as an addresser, DOT number 209.587-010, with 12,493 jobs nationally and 458 in the state of Missouri, and information clerk, DOT number 237.367-046, with 997,080 jobs nationally and 15,220 in the state of Missouri. Both positions are sedentary and unskilled with an SVP of 2. (Tr. 65-66)

Upon examination by Keeling's counsel, Gonzalez stated that if the individual required more than regularly scheduled rest breaks to complete the workday at least once a week, she would need to be accommodated and allowed to take those extra breaks. (Tr. 66) Typically, such accommodations would not be allowed in an unskilled job. (Tr. 66) While the information clerk and cashier positions require contact with the public, the addresser and mail sorter positions do not. (Tr. 66)

### B.     Medical Records

The ALJ summarized Keeling's medical records at Tr. 23-27.  Relevant medical records are discussed as part of the analysis.

### IV.     Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work

exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." <u>Goff v. Barnhart</u>, 421 F.3d 785, 790 (8th Cir. 2005) (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." <u>Page v. Astrue</u>, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. <u>Id</u>.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his

past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); <u>McCoy v. Astrue</u>, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. <u>Id</u>.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. <u>Brantley</u>, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. <u>Id</u>. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." <u>Meyerpeter v. Astrue</u>, 902 F.Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. <u>Pate–Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir.2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. <u>Cox v. Astrue</u>, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. <u>See</u> <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir.2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

    (1) The findings of credibility made by the ALJ;

    (2) The education, background, work history, and age of the claimant;

    (3) The medical evidence given by the claimant's treating physicians;

    (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

    (5) The corroboration by third parties of the claimant's physical impairment;

    (6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

    (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

**V.  Discussion**

In her appeal of the Commissioner's decision, Keeling alleges the ALJ's decision that prior to June 22, 2012, she had the RFC to perform light work with certain limitations is not supported by substantial evidence because (1) the ALJ improperly evaluated her impairments and failed to account for additional limitations (Doc. No. 21 at 14-17); (2) assigned incorrect weight to the opinion evidence of record (id. at 17-18); and (3) improperly analyzed her credibility. (Id. at 18-20) For the following reasons, the Court finds the ALJ's RFC determination is supported by substantial evidence in the record.

A claimant's RFC is defined as the most an individual can do despite the combined effects of all of his or her credible limitations. Moore, 572 F.3d at 523. The ALJ must determine a claimant's RFC based on all of the record evidence, including the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. See Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013) (RFC must be determined based on all relevant evidence, including medical records, observations of treating

physicians and others, and claimant's own description of her limitations, and supported by some medical evidence). Social Security Ruling 96-8p requires the ALJ to include in the decision a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence.

The Court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Keeling's credibility was essential to his determination of other issues, including Keeling's RFC. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010).

**Credibility determination**

In evaluating a claimant's credibility, the ALJ should consider the claimant's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). The claimant's relevant work history and the absence of objective medical evidence to support the complaints may also be considered, and the ALJ may discount subjective complaints if there are inconsistencies in the record as a whole. Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (citing Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Id. (citing Hall v. Chater, 62 F.3d 220, 223 (8th Cir.1995)). The Court will uphold an ALJ's credibility findings, so long as they are adequately explained and supported. Ellis, 392 F.3d at 996. See also Moore, 572 F.3d at 524 ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.").

First, the ALJ considered the lack of a medical basis for Keeling's alleged need for oxygen 24 hours a day, seven days a week and concluded that Keeling, "either consciously or

unconsciously, has used oxygen as a tactic to embellish her medical condition." (Tr. 27-28) On September 7, 2009, Keeling was admitted to the hospital for a COPD exacerbation. She was discharged on September 12, 2009 with a few liters of oxygen to be used on a temporary basis. (Tr. 27, 544) ("Pt. oxygen being weaned per saturation goals.") During an office visit on April 29, 2011, Trevor P. King, M.D., observed that Keeling was no longer on oxygen after being told by EMS that she did not need oxygen.[1] Dr. King also noted Keeling had only been using one liter of oxygen prior to discontinuing its use. (Tr. 29, 993) During an office visit on November 7, 2011, Dr. King reported Keeling's oxygen level at rest was 97, within the normal range, and that her respiratory effort was normal. There was no evidence of oxygen use by Keeling at that time. (Tr. 28, 949) At a preoperative medical evaluation on September 7, 2012, Kelly J. Bain, M.D., noted Keeling had overnight oximetry in 2011 with lowest saturation at 82%, which was not significant enough time under 89% to qualify for oxygen use at night. (Tr. 28, 908) Dr. Bain also noted Keeling had not had formal PFT testing to assess her pulmonary risk. He further noted she was not using oxygen but that her COPD was controlled. (Tr. 28, 908)

Additional examination records during this time indicate Keeling's respiratory effort was within a normal range, with oxygen levels at rest at 96, and no evidence of oxygen use. (See Tr. 925, 927, 931-32, 938) Then, on October 12, 2012, Keeling visited Dr. Bain's office using oxygen tanks; there is no explanation in the record for this change, although the ALJ notes Keeling received her hearing notice on October 1, 2012. (Tr. 28, 217, 901) Keeling's oxygen level at rest on October 12, 2012 was 98, at the upper level of normal, and Dr. Bain did not prescribe oxygen at the visit. (Tr. 905)

---

[1] The ALJ noted it was "more than a little unusual" that Keeling had discontinued her use of oxygen in 2011 on the advice of an EMT as opposed to a doctor. (Tr. 27-28)

The ALJ found Keeling's credibility was significantly undermined by this evidence, as well as by the lack of evidence of any PFT testing in the record inconsistent with the consistently normal findings of oxygen levels at rest which would support the medical necessity of oxygen 24 hours a day, seven days a week. (Tr. 28) Inconsistencies in the record can show that a claimant is not credible. See Eichelberger, 390 F.3d at 589 (An ALJ may disbelieve a claimant's subjective complaints because of inherent inconsistencies or other circumstances."); Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) ("[T]he ALJ found [claimant] unreliable because his testimony at the administrative hearing regarding his consumption of alcohol conflicted with medical documentation. This was a sufficient reason for discrediting [claimant] and we defer to the ALJ's judgment on this issue").

Second, the ALJ considered the fact that Keeling continued to smoke a pack of cigarettes per day (Tr. 67) despite her doctor's directives to quit. (Tr. 29, 697, 772, 901, 905, 908, 912) "It is notable that [Keeling] has continued to smoke cigarettes against medical admonishments to quit. This would certainly not be recommended behavior for an individual experiencing severe breathing difficulties." (Tr. 29) The failure to follow a prescribed course of remedial treatment, including the cessation of smoking, without good reason is grounds for denying an application for benefits. See Wheeler, 224 F.3d at 895 (ALJ properly applied credibility factors in determining that testimony of claimant who sought disability and SSI benefits was not credible where claimant smoked two packs of cigarettes per day, despite her complaints of asthma and despite directions to quit by a treating physician). See also Choate, 457 F.3d at 872 (concluding that an ALJ may properly consider a claimant's failure to quit smoking)

Third, the ALJ considered the lack of objective medical evidence to support the degree of limitation alleged. (Tr. 24-31) For instance, the ALJ acknowledged Keeling has some breathing

limitations as a result of her COPD but that most of her symptoms were resolved with the use of antibiotics, nebulizer treatments and intravenous steroids. (Tr. 29, 707, 908) "Impairments that are controllable or amenable to treatment, including certain respiratory problems, do not support a finding of disability." Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997).

Keeling was treated for a heart condition in 2009-2010, but testified she had not seen a cardiologist since that time. (Tr. 29, 48) The ALJ concluded that with no treatment for heart disease in the past two years, and no evidence of any need for emergency treatment, Keeling has no severe impairment associated with a cardiac problem. (Tr. 29) A lack of treatment is a basis for discounting complaints. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (affirming the ALJ's credibility analysis which relied, in part, on the claimant's limited treatment of his symptoms).

Similarly, Keeling alleged some effects from surgery for a left ankle fracture in May 2008. There was no evidence to suggest she needed a cane or other device for ambulation nor had she received any recent treatment for complications following surgery. (Tr. 30) Nevertheless, the ALJ accounted for any residuals existing after surgery in his RFC determination. (Tr. 29-30)

The ALJ noted Keeling has been diagnosed with diabetes mellitus. There was no evidence she had been hospitalized for a hyper or hypoglycemic event; it was Keeling's testimony that she controls her diabetes through diet alone (Tr. 671) and treatment notes reflect her condition is under good control. (Tr. 30, 999)

The ALJ also considered radiographic evidence of mild degenerative disc disease of the lumbar and cervical spine. (Tr. 30) Although no doctor has prescribed any specific therapy or

recommended surgery for this condition, the ALJ accounted for any limitations associated with degenerative disc disease in his RFC determination. (Tr. 30)

The ALJ further considered that Keeling has received intermittent treatment for bipolar disorder and anxiety disorder and that her condition improved with treatment. (Tr. 31, 671, 772, 1009) Again, impairments that are controllable or amenable to treatment do not support a finding of total disability. See Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

Fourth, the ALJ considered Keeling's daily activities. Keeling reported doing very little in a typical day. (Tr. 333-340) She testified she typically wakes up at 2:00 or 3:00 a.m. and frequently naps during the day. (Tr. 61-62) She doesn't leave her house very often. (Tr. 62) She doesn't do any house or yardwork. She doesn't cook. (Tr. 62) Keeling could not remember the last time she drove a car. (Tr. 62) The ALJ found no evidence that any physician recommended she limit her activities which suggested these restrictions were self-imposed. (Tr. 31) "A record ... which does not reflect physician imposed restrictions suggests that a claimant's restrictions in daily activities are self-imposed rather than by medical necessity." Rosa v. Astrue, 708 F.Supp.2d 941, 958 (E.D.Mo.2010) (citing Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir.2004)). See also Brown v. Chater, 87 F.3d 963, 964–65 (8th Cir.1996) (holding that the lack of significant restrictions imposed by treating physicians supported the ALJ's decision finding that there was no disability).

The ALJ also considered the lack of evidence that Keeling had any side effects from medication that would significantly impact her ability to work. (Tr. 30) Although she testified that her inhaler made her feel "jittery" (Tr. 55), the ALJ noted such side effects are not reflected in the treatment notes. (Tr. 30) Keeling's prior work record and sporadic earnings record did not

significantly impact her credibility, "as she has worked with some consistency in the past, albeit for low wages." (Tr. 31)

As for the opinion evidence, the ALJ considered the report from Robert M. Patterson, D.O., dated March 20, 2009, wherein Dr. Patterson opines that Keeling has become "unemployable" based on her history of bipolar disease and emphysema and the fact that her medications are "maxed out." (Tr. 531) According to Dr. Patterson, Keeling lacks the ability to work with other people and that any type of stress "would just put her over the edge." (Id.) The ALJ gave Dr. Patterson's opinion little weight because he did not identify any clinical basis for his opinion. (Tr. 31) Further, Dr. Patterson is not a mental health specialist, so his opinion regarding the vocational implications from mental impairments is entitled to no weight. (Tr. 32) See 20 C.F.R. §§ 404.1527(c)(5); 416.927(c)(5). Lastly, a treating physician's opinion that the claimant is disabled or unable to work, is not a medical opinion, but an opinion on the application of the statute. However, applying the statute is a task "assigned solely to the discretion of the [Commissioner]." See Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir.1991).

Moreover, Dr. Patterson's opinion regarding Keeling's ability to work was inconsistent with other medical reports/opinions detailed in the ALJ's decision. (Tr. 32, 24-27) For instance, John B. Crane, M.D., completed a psychiatric evaluation of Keeling on December 7, 2009. He noted she was taking Paxil and Zyprexa for bipolar disorder and Xanax four times a day as needed. Dr. Patterson opined that these medications have kept Keeling "reasonably stable." (Tr. 772) He also noted that Keeling's husband reported his wife "has been doing relatively well recently." (Id.) During a physical examination on February 10, 2010, Dr. King reported that Keeling was in no apparent distress; straight leg raise testing was negative. (Tr. 707-710) At her next visit on March 2, 2010, Dr. King reported that Keeling had normal respiratory effort and her

lungs were clear to auscultation. (Tr. 701) In August 2010, Dr. King noted Keeling's bipolar disorder was stable and maintained well on medication. (Tr. 31, 671) On September 28, 2010, consultative hematologist Isaac Cohen, M.D., concluded Keeling had mild erythrocytosis likely related to both COPD and ongoing smoking and opined she did not need further treatment. (Tr. 760) In March 2011, Dr. King remarked that Keeling's psychiatrist would no longer see her and canceled her Xanax prescription. (Tr. 31, 1009) On March 15, 2012, Chinya Murali, M.D., a psychiatrist, noted Keeling was much better, with mild mood swings, and no reporting of any depressive symptoms. (Tr. 31, 1043) Dr. Murali found Keeling's global assessment of functioning (GAF) between 80-90, which indicates only mild or transitory symptoms.[2] (Id.) "If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007).

In sum, the ALJ considered Keeling's subjective complaints of disability on the basis of the entire record and set out specific reasons for discounting her credibility. Because the ALJ's determination not to credit Keeling's subjective complaints is supported by good reasons and substantial evidence, the Court defers to his determination. Cobb v. Colvin, 2014 WL 6845850, at *14 (E.D.Mo. Dec. 3, 2014) (internal citations omitted). See also Polaski, 739 F.2d at 1322.

**Evaluation of impairments/treating source opinions**

Despite Keeling's assertion to the contrary, the ALJ properly evaluated her impairments and the evidence of record in his RFC determination. "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental

---

[2] A GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 32-34 (4th Ed. Text Revision 2000). A GAF score of 81 to 90 indicates "absent of minimal symptoms . . . good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns." Id.

ability to do basic work activities." <u>Kirby v. Astrue</u>, 500 F.3d 705, 707 (8th Cir. 2007). <u>See also</u>

<u>Page</u>, 484 F.3d at 1043 (quoting <u>Caviness</u>, 250 F.3d at 605). Symptoms "will not be found to

affect [a claimant's] ability to do basic work activities unless medical signs or laboratory

findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b).

In addition, only evidence from acceptable medical sources (such as licensed physicians) can

establish the existence of a medically determinable impairment. <u>Sloan v. Astrue</u>, 499 F.3d 883,

888 (8th Cir. 2007). It is the claimant's burden to establish that her impairment or combination of

impairments is severe. <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 852 (8th Cir.2000). Although severity

is not an onerous requirement, it is also not a toothless standard. <u>Kirby</u>, 500 F.3d at 708.

First, in determining Keeling's RFC, the ALJ considered Keeling's credibility, as

discussed above, and found her not fully credible. <u>See</u> <u>Tucker v. Barnhart</u>, 363 F.3d 781, 783

(8th Cir. 2004). The ALJ only included Keeling's credible limitations in her RFC. <u>See</u> <u>Tindell v.</u>

<u>Barnhart</u>, 444 F.3d 1002, 1007 (8th Cir.2006) ("The ALJ included all of [claimant's] credible

limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial

evidence in the record.").

Second, the ALJ considered Keeling's medical records and the opinions of medical

professionals and incorporated those limitations which he found to be consistent with her

medical records in the RFC.[3] <u>See</u> <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001). As

discussed above in regards to Keeling's credibility, the ALJ concluded that while Keeling may

continue to have some limitations associated with breathing issues due to her COPD, there was

---

[3] Keeling appears to contend the ALJ failed to provide a narrative describing how the medical and nonmedical evidence supports each conclusion. (Doc. No. 21 at 13-14) In fact, the ALJ provided an extensive and detailed discussion of the evidence of record, including objective test results, examination results, and the opinions of Keeling's doctors. <u>See</u> <u>Wonsewitz v. Astrue</u>, 2012 WL 3548034, at *16 (E.D. Mo. Aug. 16, 2012).

no evidence suggesting she would be more restricted than had been indicated in the RFC statement. (Tr. 29)  The ALJ accommodated Keeling's difficulty breathing as her RFC limits her exposure to extremes in temperature. (Tr. 22)

Likewise, there was no evidence Keeling has any limitations associated with a mental impairment greater than those reflected in the RFC, which reflects an ability to understand, remember and carry out simple instructions and non-detailed tasks, adapt to routine/simple work changes, maintain regular attendance without special supervision, all in a setting where contact with others was casual and infrequent. (Id.) The ALJ also specifically accounted for any residuals existing after surgery for Keeling's left ankle fracture, as well as for limitations associated with degenerative disc disease in the RFC determination. (Tr. 29-30)

The ALJ determined Keeling had no severe impairments associated with cardiac problems (Tr. 29) or diabetes mellitus. (Tr. 30) The ALJ concluded that with no treatment for heart disease in the past two years, and no evidence of any need for emergency treatment, Keeling has no severe impairment associated with a cardiac problem. (Tr. 29) Similarly, there was no evidence Keeling had been hospitalized for a hyper or hypoglycemic event and treatment notes indicated her diabetes is under good control. (Tr. 30, 999)

In sum, the ALJ found the objective evidence of record did not establish any severe medically determinable condition or impairment and substantial evidence supports that determination.

Keeling relies on a number of source statements and letters from treating sources to support additional limitations beyond those found by the ALJ. For instance, in a letter dated November 16, 2007, Dr. Patterson noted bipolar disorder, chronic bronchitis and chronic abdominal distention secondary to ascites and opined that given Keeling's medical and mental

condition, her ability to hold gainful employment is "almost non-existent." (Tr. 496) In a letter dated November 26, 2008 addressing Keeling's condition from April 14, 2005 through October 10, 2008, Dr. Patterson stated [Keeling's] physical and emotional conditions "are such that it would make it difficult for her to obtain gainful employment." (Tr. 529) In a letter dated February 16, 2009, Dr. Patterson indicated that Keeling's bipolar disorder "would be totally out of control" in a work environment. He opined that Keeling is "totally unable" to hold any type of gainful employment. (Tr. 530) On March 20, 2009, Dr. Patterson opined that Keeling has become "unemployable" based on her history of bipolar disease and emphysema and the fact that her medications are "maxed out." (Tr. 531)

In a letter dated January 4, 2008, Brian Edwards, D.O., detailed Keeling's chronic conditions of bipolar disorder with anxiety, panic attacks and frequent breakthrough symptoms, depression, chronic obstructive pulmonary disease ("COPD") limiting strenuous activity, elbow tendonitis and thoracic pain, all of which he opines would affect her ability to hold a job. (Tr. 443)

By letter dated August 6, 2012, rheumatologist Sandra S. Hoffmann, M.D., opined that Keeling is permanently disabled "in both a physical and psychiatric basis" and "would not be able to work meaningfully for any period of time." (Tr. 779) She notes Keeling has a combination of avascular necrosis, severe degenerative arthritis, lumbar and cervical degenerative joint disease and radiculopathy into the legs. (Id.)

On December 11, 2012, Kelly Bain, M.D., completed a medical source statement opining that Keeling could stand only 10 minutes at a time and 2 hours total, walk 20-30 yards before needing to rest, so less than 1 hour total, and sit for 30-45 minutes due to back pain. (Tr. 1048) Keeling cannot push or pull due to dyspnea and wearing a portable oxygen tank but can use foot

or hand controls for 30 minutes at a time before fatiguing. Dr. Bain also noted that COPD limits exertions. (Id.)

Lastly, on January 17, 2013, Chinya Murali, M.D. completed a medical source statement noting numerous limitations including the inability to follow rules, trouble dealing with work stress, poor attention and concentration, and period of increased depression and anxiety. (Tr. 1037)

A treating physician's opinion is generally entitled to substantial weight but does not automatically control. Brown v. Astrue, 611 F.3d 941, 951-52 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 880 (8th Cir.2009) (internal quotations and citation omitted). "An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Id. See also Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir.2015). In addition, treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," because it invades the province of the Commissioner to make the ultimate determination of disability). Regardless of the weight the ALJ decides to afford the opinion of a medical source, the ALJ must "always give good reasons" for the weight assigned to the opinion. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir.2000); Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.2000)).

As discussed above, the ALJ gave Dr. Patterson's opinion regarding Keeling's ability to work little weight because he did not identify any clinical basis for his opinion and because his opinion was inconsistent with other medical reports/opinions in the record. (Tr. 32, 24-27) The

ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002). Further, because Dr. Patterson is not a mental health specialist, his opinion regarding the vocational implications from mental impairments was entitled to no weight. See 20 C.F.R. §§ 404.1527(c)(5); 416.927(c)(5). (Tr. 32)

Likewise, the ALJ accepted Dr. Hoffman's opinion from a physical standpoint but rejected it from a psychological standpoint because Dr. Hoffman is not a mental health professional. (Tr. 32) More weight is generally given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a treating source who is not a specialist. Brown, 611 F.3d at 953 (and cases cited therein). The ALJ gave Dr. Hoffman's opinion considerable weight in finding Keeling disabled since June 22, 2012. (Tr. 33)

Dr. Bain's opinion was given no weight because it conflicted with his own records and appeared to be based on Keeling's assertion that she required oxygen 24 hours a day, seven days a week. (Tr. 28, 33) His treatment records demonstrate no need for oxygen and do not show he prescribed it in the last few years. (See Tr. 895-937) Further, while Dr. Bain alleged that a PFT study was performed on September 20, 2012, a different date than alleged in his records previously, there is no record of such a study in the record.

The ALJ did not specifically address Dr. Edward's opinion in his decision; however, the ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure to cite specific evidence does not indicate such evidence was not considered. Wheeler, 224 F.3d at 896 n. 3 (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)). Moreover, the conditions detailed in Dr. Edward's letter opinion were addressed in extensive detail throughout the ALJ's decision and conflicted with other evidence in the record.

Lastly, because the ALJ found Keeling disabled as of June 22, 2012, he did not address Dr. Murali's medical source statement, except to state that it was consistent with the decision. (Tr. 33)

Upon review of the record, the Court concludes the ALJ properly evaluated the medical opinions, listing "good reasons" for giving them little weight. <u>Prosch</u>, 201 F.3d at 103. More importantly, the ALJ provided a detailed narrative discussion of how the medical facts and on-medical evidence supported his finding. The Court finds, therefore, that the ALJ's treatment of the medical source opinions is supported by substantial evidence on the record as a whole.

**VI.    Conclusion**

For these reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

Dated this 24th day of September, 2015.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**